**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

SEYED REZA SAADAT MOSTAFAVI, ATOUSA ASSADZADEH GHARACHEHDAGHI, *on behalf of themselves and their minor child* A.S.S.M.,

*Plaintiffs*,

v.

DONALD J. TRUMP, *in his official capacity as President of The United States of America*
1600 Pennsylvania Avenue NW
Washington, DC 20500

MARCO RUBIO, *in his official capacity as U.S. Secretary of State*,
U.S. Department of State
The Executive Office
Office of the Legal Adviser
Suite 5.600
600 19th Street NW
Washington, DC 20522

*Defendants*.

Civil Action No.: 1:25-cv-12287

**PLAINTIFFS' COMPLAINT FOR DECALARATORY AND INJUNCTIVE RELIEF AND PETITION FOR WRIT OF MANDAMUS**

# TABLE OF CONTENTS


TABLE OF EXHIBITS ..... iii

JURISDICTION ..... 4

VENUE ..... 7

PARTIES ..... 7

PLAINTIFFS ..... 7

DEFENDANTS ..... 8

STATUTORY AND REGULATORY FRAMEWORK ..... 9

Employment-based Immigration Visa Application ..... 9

a. EB-2 National Interest Waiver ..... 10

b. Consular Processing for Immigration Visa Applications ..... 11

c. Defendants' Mandatory Duty to Adjudicate Visa Applications. ..... 16

STATEMENT OF FACTS ..... 19

Proclamation 10949 and Its Dire Negative Impacts ..... 22

Separation of Powers and Nondelegation Doctrine ..... 25

Defendants' No NIE Policy ..... 27

Defendants' No Visa Policy ..... 28

CAUSES OF ACTION ..... 30

COUNT ONE: Separation of Powers/Nondelegation Doctrine ..... 30

COUNT TWO: 5 U.S.C. § 706(2)(A) and (D). ..... 31

COUNT THREE: 5 U.S.C. § 706(2)(C) ..... 32

COUNT FOUR: 5 U.S.C. § 706(2)(A) ..... 34

COUNT FIVE: Violation of the APA, 5 U.S.C. § 706(2) ..... 35

COUNT SIX: Violation of the APA, 5 U.S.C. § 706(1) ..... 37

COUNT SEVEN: Violation of the APA; 5 U.S.C. § 555(b) ..... 39

COUNT EIGHT: Mandamus Act, 28 U.S.C. § 1361 ..... 40

PRAYER FOR RELIEF ..... 43

## TABLE OF EXHIBITS

**Exhibit A** *212(f) Email*

**Exhibit B** *April 10, 2025, Declaration of Robert Jachim*

**Exhibit C** *I-140 Approval Notice*

**Exhibit D** *Passport Email*

**Exhibit E** *Declaration of Plaintiff Mostafavi*

**Exhibit F** *Articles on the unparalleled consequences of Proclamation 10949*

**Exhibit G** *Trump considers adding 36 countries to travel ban list*

**Exhibit H** *Applying NIE only via a New Visa Application*

**Exhibit I** *State Department's Arbitrary and Capricious Position on NIE*

1. Plaintiffs Seyed Reza Saadat Mostafavi, Atousa Assadzadeh Gharachehdaghi, and A.S.S.M ("Plaintiffs") by and through the undersigned counsel, respectfully bring this Complaint for Declaratory and Injunctive Relief and Petition for Writ of Mandamus against President Donald J. Trump and Secretary of State Marco Rubio ("Defendants") and those acting under them. Plaintiffs respectfully challenge President Trump's Proclamation 10949, *Restricting the Entry of Foreign Nationals to Protect the United States from Foreign Terrorists and Other National Security and Public Safety Threats*, 90 Fed. Reg. 24497 (June 10, 2025) ("PROCLAMATION 10949") and Defendants' implementation hereof, including both treating the entry ban as an issuance ban ("No Visa Policy"), and the State Department not honoring the Department of Homeland Security's prior finding of Plaintiffs' entry being in the national interest ("No NIE Policy"); Plaintiffs ask that Proclamation 10949 be enjoined, and also ask the Court to compel Defendants to remedy Plaintiffs' injuries by providing proper adjudications for the immigrant visa applications of Plaintiffs, other than under INA 212(f),without further delay.

2. Due to its intent divorced from national security concerns and severe negative economic and humanitarian consequences, Proclamation 10949 exceeds the Congress' delegation of authority to the President to issue a travel ban; further, Defendants' policy and procedure to implement Proclamation 10949, especially its "national interest" exception ("NIE"), *i.e.* the No NIE Policy, is arbitrary and capricious; moreover, in implementing Proclamation 10949, the State Department continues with a policy of conflating an entry ban with an issuance ban, *i.e.* the No Visa Policy, not in accordance with law and excess of statutory authority (a policy which courts have previously enjoined, *see e.g. Rai v. Biden*, 567 F. Supp. 3d 180 (D.D.C. 2021)); in addition, such No Visa Policy is arbitrary and capricious; last but not least, Plaintiffs' visa applications are unreasonably delayed and unlawfully withheld by Defendants.

3. Plaintiffs are Iranian nationals who are applicants for employment-based immigrant visas, with a derivative spouse and minor child beneficiaries.

4. Plaintiffs in this action submitted a Form DS-260, *Online Immigrant Visa and [Noncitizen] Registration Application* ("DS-260"), and the DS-260 application was found by the National Visa Center ("NVC") to be "Documentarily Qualified" or "Documentarily Complete."

5. Plaintiffs attended an interview by a consular officer at a U.S. Embassy or Consulate. At the interview, Plaintiffs presented valid unexpired passports or other suitable travel documents. Further, Plaintiffs furnished to the consular officer with their visa applications all documents concerning them or their individual cases which may be required by the consular officer. Yet, they received requests from the consular officers after the interview to submit the Form DS-5535, *Supplemental Questions for Visa Applicants*[1] ("DS-5535"); and their case was placed into administrative processing pending nearly a year after the interview before the administrative processing was cleared.

6. On June 4, 2025, Defendant Trump issued Proclamation 10949, which put in sweeping "full suspension of entry" of 12 countries including Iran and bans on immigrants, and nonimmigrants on B-1, B-2, B-1/B-2, F, M, and J visas from an additional 7 countries. Proclamation 10949 provides some exceptions: anyone with a current green card or a current valid visa; people who are applying for Immediate Relative of U.S. citizen visa categories (spouses,

---

[1] Form DS-5535, *Supplemental Questions for Visa Applicants*, was created in 2017 to facilitate enhanced vetting related to the Trump administrations series of travel bans targeting Muslim-majority countries. *See:* https://www.federalregister.gov/documents/2017/05/04/2017-08975/notice-ofinformation-collection-under-omb-emergency-review-supplemental-questions-forvisa. *See also*: https://www.documentcloud.org/documents/4064970-Title-of-Information-Collection-Supplemental, Title of Information Collection Supplemental Questions for Visa Applicants OMB Control Number 1405 0226 Form Number DS 5535.

minor children, and parents); and refugees; asylees; and individuals granted humanitarian protection; diplomats and NATO personnel; dual nationals traveling on a non-banned-country's passport; children adopted abroad; Afghans seeking Special Immigrant Visas for their work helping U.S. armed forces; ethnic or religious minorities fleeing persecution in Iran; athletes, coaches, support staff, and immediate relatives of athletes participating in "major sporting events" like the World Cup and the Olympics; immigrant visas for ethnic and religious minorities facing persecution in Iran; and any individual whose entry is deemed in the "national interest", etc.

7. However, given the U.S. Refugee Assistance Program ("USRAP") was already suspended indefinitely by Executive Order 14163, *Realigning The United States Refugee Admissions Program*, 90 Fed. Reg. 8459 (January 30, 2025), these exceptions seem to exist in name only. The exception for individuals who "would serve a United States national interest" ("NIE") is especially elusive as discussed below.

8. After Plaintiffs' "refusal" for 221(g) non-final administrative processing they became subject to Proclamation 10949 and Defendants' No Visa Policy and No NIE Policy.

9. The delays in adjudication of Plaintiffs' applications have placed severe emotional and financial strain on the Plaintiffs. Plaintiffs have been unable to definitively plan for their family's future.

10. Statutes, regulations, and agency guidance make clear that the Defendants have a nondiscretionary duty to adjudicate Plaintiffs' applications within a reasonable time – a duty which they have failed to fulfill.

11. As a result of the unreasonable delay in final adjudications, Plaintiffs have suffered concrete, severe, and particularized injury.

12. Plaintiffs are entitled to a decision on their immigrant visa applications. *See* 22 C.F.R. § 42.81(a) ("Issuance or refusal mandatory. When a visa application has been properly completed and executed before a consular officer in accordance with the provisions of INA and the implementing regulations, the consular officer must either issue or refuse the visa[.]") (emphasis added); *see also* sections 101(a)(9), (16), 201(b)(2)(A)(i) of the Immigration and Nationality Act ("INA"), 8 U.S.C. §§ 1101(a)(9), (16), 1201(b)(2)(A)(i); *Patel v. Reno*, 134 F.3d 929, 932 (9th Cir. 1997) ("A consular office is required by law to act on visa applications."),

13. Plaintiffs' immigrant visa applications remain within the jurisdiction of the Defendants, who have improperly withheld action for more than fifteen months and counting since the interview, to the extreme detriment of the rights and privileges of Plaintiffs; such delay also caused Plaintiffs to suffer the consequences of Proclamation 10949 and Defendants' No Visa Policy and No NIE Policy.

14. Plaintiffs turn to the Court seeking an order to compel the Defendants and those acting under them to cease the Proclamation 10949 implementation and Defendants' No NIE Policy, No Visa Policy, and immediately and forthwith take all appropriate action to fulfill their mandatory, non-discretionary duty to provide final adjudications of Plaintiffs immigrant visa applications.

## JURISDICTION

15. This case arises under the United States Constitution; the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq*.; and the Administrative Procedure Act ("APA"), 5 U.S.C. § 555(b) and § 701 *et seq*. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1329, and 1361.

16. This is a civil action brought pursuant to 28 U.S.C. § 1361 (writ of mandamus). Jurisdiction is further conferred by 8 U.S.C. § 1329 (jurisdiction of the district courts) and 28 U.S.C. § 1331 (federal subject matter jurisdiction). This Court also has authority to grant declaratory relief under 28 U.S.C. § 2201 and 2202, and injunctive relief under 5 U.S.C. § 702 and 28 U.S.C. § 1361.

17. Under 28 U.S.C. § 1361, "[t]he district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff."

18. Plaintiffs are challenging the Defendants' authority to withhold the proper adjudications of Plaintiffs' immigrant visa applications, and are not challenging decisions which are within the discretion of the Defendants. Therefore, jurisdiction exists for this Court to consider whether Defendants have the authority to withhold adjudication. *See Patel*, 134 F.3d at 932; *Raduga USA Corp. v. United States Dep't of State*, 440 F. Supp. 2d 1140, 1149 (S.D. Cal. 2005) (finding mandamus jurisdiction where "Plaintiffs simply seek to compel the consul to render a final decision on Plaintiff's visa application which is mandated under [8 C.F.R.] § 42.81(a)").

19. Jurisdiction is also conferred pursuant to 5 U.S.C. §§ 555(b) and 702. The APA requires the Defendants to carry out their duties within a reasonable time. 5 U.S.C. § 555(b) provides that "[w]ith due regard for the convenience and necessity of the parties or their representatives and within a reasonable time, each agency shall proceed to conclude a matter presented to it." The Defendants are subject to 5 U.S.C. § 555(b). *See Patel*, 134 F.3d at 931-32 ("Normally a consular official's discretionary decision to grant or deny a visa petition is not subject to judicial review. However, when the suit challenges the authority of the consul to take or fail to take an action as opposed to a decision taken within the consul's discretion, jurisdiction exists.")

(Internal citations omitted); *Raduga USA*, 440 F. Supp. 2d at 1146 ("[T]he Court finds that Plaintiffs have sufficiently demonstrated Article III standing to bring this APA mandamus action.") *See also*, *Trudeau v. FTC*, 456 F.3d 178, 185 (D.C. Cir. 2006) (finding that district court has jurisdiction under the APA, in conjunction with 28 U.S.C. § 1331, to review Plaintiffs' complaint for declaratory and injunctive relief against federal agency); *Liberty Fund, Inc. v. Chao*, 394 F. Supp. 2d 105, 114 (D.D.C. 2005) ("The [APA] requires an agency to act, within a reasonable time,‟ 5 U.S.C. § 555(b), and authorizes a reviewing court to compel agency action … unreasonably delayed,‟ 5 U.S.C. § 706(1).")

20. Section 242 of the INA, 8 U.S.C. § 1252, does not deprive this Court of jurisdiction. INA § 242(a)(5) provides that "a petition for review filed with an appropriate court of appeals in accordance with this section, shall be the sole and exclusive means for judicial review of an order of removal entered or issued under any provision of this Act[.]" As the present action does not seek review of a removal order, but is simply an action to compel the Defendants to adjudicate the Plaintiffs' unreasonably delayed applications, this Court retains original mandamus jurisdiction under 28 U.S.C. § 1361. *See Liu v. Novak*, 509 F. Supp. 2d 1, 5 (D.D.C. 2007) ("[T]here is … significant district court authority holding that [8 U.S.C.] § 1252(a)(2)(B)(ii) does not bar judicial review of the pace of application processing or the failure to take action.") As set forth below, the delay in adjudicating Plaintiffs' immigrant visa applications is unreasonable.

21. Under the APA, a reviewing court may order action unlawfully withheld, and may also "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, and abuse of discretion, or otherwise not in accordance with law" and agency action taken "without observance of procedure required by law." 5 U.S.C. §§ 706(1), 706(2)(A), 706(2)(D).

22. Federal regulations are unambiguous that the Embassy has a mandatory and affirmative duty to adjudicate a properly filed immigrant visa application where the underlying Form I-140 immigrant visa petition ("Form I-140") has been approved by U.S. Citizenship and Immigration Services ("USCIS") and forwarded to the appropriate overseas embassy. 22 C.F.R. § 42.81(a); *see also* INA § 201(d) ("Worldwide level of employment-based immigrants.").

23. The court has further remedial authority under the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq*., and the APA 5 U.S.C. § 500 *et seq*.

## **VENUE**

24. Pursuant to 28 U.S.C. § 1391(e), venue is proper in this district on the following grounds: Defendants are an officer of the United States or agency of the United States; no real property is involved; and acts or omissions giving rise to the action occurred in part in this judicial district as Plaintiff Seyed Reza Saadat Mostafavi has been offered an Abdominal Imaging Fellowship position in the Department of Radiology at Beth Israel Deaconess Medical Center, Harvard Medical School, located in Suffolk County which is within the Eastern Division of this district. Plaintiffs' fellowship is dependent on Defendants action on the immigrant visa.

25. This civil case is related to *Saadat Mostafavi et al v. Rubio et al*, 1:25-cv-10185 because some or all of the parties are the same; and the cases involve the same or substantially similar issues of fact and the cases arise out of the same occurrence. Local Rule 40.1(g)(1)(A), (B)(i)(ii).

## **PARTIES**

### **PLAINTIFFS**

26. Plaintiff Seyed Reza Saadat Mostafavi is an Iranian national with an approved Form I-140 self-petition in the EB-2 National Interest Waiver visa category. He is a physician and

researcher who has passed all United States medical licensing exams and obtained Educational Commission for Foreign Medical Graduates certification. He has been offered a fully funded research and imaging fellowship at Harvard University.

27. Following the approval of the I-140 on April 26, 2022, the petition was forwarded to the NVC. The NVC created consular case number YRV2023665007 for Plaintiffs.

28. Plaintiffs filed the DS-260 on November 8, 2022, and became documentarily qualified on November 30, 2022. A visa interview at the U.S. Embassy in Yerevan, Armenia was not scheduled until May 23, 2024.

29. Plaintiff Atousa Assadzadeh Gharachehdaghi, is an Iranian national and a derivative beneficiary spouse of the approved I-140. She is a derivative applicant for the immigrant visa. A.S.S.M is their minor child, and a derivative applicant for the visa.

30. On May 23, 2024, Plaintiffs attended an immigrant visa interview at the U.S. Embassy in Yerevan ("the Embassy"). Following their interview, the consular officer issued a non-final 221(g) notice for administrative processing, and requested DS-5535 responses, which they timely provided that same day, May 23, 2024.

31. The Embassy has now informed Plaintiffs that they are improperly refusing to adjudicate the visa application because "a consular officer found you ineligible for an immigrant visa under Section 212(f) of the Immigration and Nationality Act, pursuant to Presidential Proclamation 'Restricting the Entry of foreign Nationals to Protect the United States from Foreign Terrorists and Other National Security and Public Safety Threats.' Today's decision cannot be appealed. Taking into account the provisions of the Proclamation, a National Interest Exception (NIE) will not be granted in your case." **Exhibit A**, *212(f) Email*.

## DEFENDANTS

32. Defendant Donald J. Trump is the President of the United States of America. On June 4, 2025, Defendant Trump issued Proclamation 10949, which this action seeks to challenge for exceeding his authority delegated by Congress. Defendant Trump is sued in his official capacity as President.

33. Defendant Marco Rubio is the Secretary of the U.S. Department of State, the department under which the U.S. embassies and consulates operate. Defendant Rubio has supervisory responsibility over the U.S. Embassies and Consulates. He is responsible for the overall administration of the Department, including the Bureau of Consular Affairs, which is responsible for the issuance of immigrant visas under the immigration laws of the United States. Defendant Marco Rubio is sued in his official capacity as Secretary of State.

## STATUTORY AND REGULATORY FRAMEWORK

### Employment-based Immigration Visa Application

34. Admitting skilled immigrants that are valuable to the U.S. economy, which has long been a key principle underlying U.S. immigration policy, is embodied in the Immigration and Nationality Act ("INA"). In 1952, Congress enacted the INA and has amended it several times since. The Immigration and Nationality Act Amendments of 1965 (Pub. L. 89-236), enacted during a period of broad social reform, eliminated the national origins quota system, which was widely viewed as discriminatory, and gave priority to immigrants with relatives living permanently in the United States. In 1990, Congress passed the Immigration Act of 1990. Pub. L. 101-649. The INA established a complex system of immigrant visa availability to classes of foreign nationals. Congress's chief goals in writing the INA were reunifying families, admitting skilled immigrants, protecting humanitarian interests, and promoting diversity. *See*, *e.g.*, *Solis-Espinoza v. Gonzales*, 401 F.3d 1090, 1094 (9th Cir. 2005). The INA authorizes consular officers to issue immigrant and

nonimmigrant visas to foreign nationals who are eligible for those visas and who are admissible to the United States. See 8 U.S.C. § 1201; 22 C.F.R. § 42.71.

35. One of the primary methods by which foreign nationals seek to immigrate to the United States is employment-based immigration. Under the INA, employment-based visas may be issued to, inter alia, noncitizens who are members of the professions holding advanced degrees or noncitizens of exceptional ability. 8 U.S.C. § 1153(b)(2). Further, "[a] spouse or child acquired prior to the principal applicant's admission to the United States or adjustment of status to that of a Lawful Permanent Resident (L.P.R.), or a child born of a marriage which existed before the principal applicant's admission to the United States as an immigrant or adjustment of status, who is accompanying or following to join the principal, should be accorded derivative status under INA 203(d)." 9 FAM § 502.1-1(C)(2).

36. Over 30 years ago, Section 101(a) of the Immigration Act of 1990 authorized a worldwide level of employment-based immigrants of no less than 140,000 per fiscal year. 8 U.S.C. § 1151(d). Section 121(a) of the Act defined the five preference categories: EB-1 priority workers; EB-2 members of the professions holding advanced degrees or noncitizens of exceptional ability; EB-3 skilled workers, professionals, and other workers; EB-4 certain special immigrants; and EB-5 employment creation. Congress allocated 28.6% of the worldwide employment-based preference annual quota, plus any numbers not required by EB-1s to the second priority of the employment-based immigration visa, also known as EB-2, which include members of the professions holding advanced degrees or persons of exceptional ability.

**a. <u>EB-2 National Interest Waiver</u>**

37. Normally, a labor certificate is required for EB-2 to protect the American workers. 8 U.S.C. § 1182(a)(5)(A)(i). However, this labor certificate requirement is waived when USCIS

"deems it to be in the national interest". 8 U.S.C. § 1153(b)(2)(B)(i). In 2016, USCIS Administrative Appeals Office ("AAO")'s binding administrative decision, *Matter of Dhanasar*, a new framework is provided when adjudicating NIW EB-2 I-140 cases:

> Under the new framework, and after eligibility for EB-2 classification has been established, USCIS may grant a national interest waiver if the petitioner demonstrates by a preponderance of the evidence: (1) that the foreign national's proposed endeavor has both substantial merit and national importance; (2) that the foreign national is well positioned to advance the proposed endeavor; and (3) that, on balance, it would be beneficial to the United States to waive the requirements of a job offer and thus of a labor certification. If these three elements are satisfied, USCIS may approve the national interest waiver as a matter of discretion.

26 I&N Dec. 884 (AAO 2016). *Dhanasar* replaced the more stringent requirements for NIW provided by the legacy Immigration and Naturalization Service ("INS") in *Matter of New York State Dep't of Transp.* ("*NYSDOT*"), 22 I&N Dec. 215 (Acting Assoc. Comm'r 1998)[2]. In providing this new framework of NIW in *Dhanasar*, AAO noted that "[t]his more flexible test, which can be met in a range of ways as described above, is meant to apply to a greater variety of individuals." *Dhanasar*, at 891.

38. As such, an EB-2 NIW immigrant visa application is first initiated when the noncitizen files Form I-140 *Immigrant Petition for Alien Workers* with USCIS. 8 U.S.C. § 1154. USCIS then uses its discretion to determine the eligibility of the petitioner pursuant to the framework provided by *Dhanasar*. 8 C.F.R. § 204.5(k).

**b. Consular Processing for Immigration Visa Applications**

[2] "The NYSDOT framework looks first to see if a petitioner has shown that the area of employment is of 'substantial intrinsic merit.' Next, a petitioner must establish that any proposed benefit from the individual's endeavors will be 'national in scope.' Finally, the petitioner must demonstrate that the national interest would be adversely affected if a labor certification were required for the foreign national." *Dhanasar*, 26 I&N Dec. 884 at 887.

39. Upon I-140 approval and visa number(s) is available, if the principal applicant and dependents, if any, is residing outside of the United States, the petition is then sent to the NVC for pre-processing, and the petitioner and dependents, if any, is able to begin the process of formally applying for an immigrant visa by submitting a DS-260.

40. After paying fees, completing the DS-260, and filing supporting documentation to the NVC for review, and the application is then sent to the embassy or consulate having jurisdiction over the noncitizen's place of residence for interview. The NVC contacts the noncitizen beneficiary in order to gather the required documents and collect the necessary fees.

41. Once the NVC has verified that the minimum required documentation has been submitted and the fees have been paid (known as "documentarily complete" or "documentarily qualified"), and when an appointment becomes available, the NVC will schedule the noncitizen beneficiary for an immigrant visa interview before a consular officer to make and execute a visa application and transfer the visa case to the relevant embassy or consulate. 22 C.F.R. § 42.67.

42. Generally, Department regulations designate the applicant's residence as the determining factor for the place of application under normal circumstances. 9 FAM § 504.4-8(A).

43. However, for "homeless" applicants, The Visa Office (VO) has designated specific posts to process those IV applications. 9 FAM § 504.4-8(E)(2)(c).

44. A "homeless" visa applicant is a national of a country in which the United States has no consular representation or the political or security situation is tenuous or uncertain enough that the limited consular staff is not authorized to process IV applications. 9 FAM § 504.4-

8(E)(1)(a). Iranian visa applicants are considered homeless and are typically assigned processing posts in Abu Dhabi, Ankara, and Yerevan.[3] 9 FAM § 504.4-8(E)(1)(b).

45. The Department of State website instructs that at the end of the immigrant visa interview at the U.S. Embassy or Consulate, the consular officer will inform you whether your visa application is approved or denied. "If your visa is denied, you will be informed by the consular officer why you are ineligible to receive a visa."[4]

46. Once "a visa application has been properly completed and executed before a consular officer in accordance with the provisions of the INA and its implementing regulations, the consular officer must either issue or refuse the visa under INA 212(a) or INA 221(g) or other applicable law." 22 C.F.R. § 42.81(a).

47. The FAM further explains that "[o]nce an application has been executed, you must either issue the visa or refuse it [...]. You cannot temporarily refuse, suspend, or hold the visa for future action. If you refuse the visa, you must inform the applicant of the provisions of law on which the refusal is based, and of any statutory provision under which administrative relief is available." 9 FAM § 504.9-2.

48. If the consular officer determines that a visa should be issued, the officer is required to arrange the appropriate visa documentation and sign and seal the immigrant visa, consistent with the requirements set forth in 22 C.F.R. § 42.73.[5] "The immigrant visa shall then be issued by delivery to the immigrant or the immigrant's authorized agent or representative." *Id.* § 42.73(d).

---

[3] Plaintiffs were originally assigned to Ankara, and then changed to Yerevan upon request.
[4] *See "The Immigrant Visa Process*," U.S. Department of State, *available at* https://travel.state.gov/content/travel/en/us-visas/immigrate/the-immigrant-visa-process/step-10-prepare-for-the-interview/step-12-after-the-interview.html (last accessed August 5, 2025)

49. Conversely, if the consular officer determines that the visa should be refused, the officer must have a basis for refusal that is "specifically set out in the law or implementing regulations." 22 C.F.R. § 40.6. The officer also must comply with the refusal procedure outlined in 22 C.F.R. § 42.81(b), which mandates, in relevant part, that the "consular officer shall inform the applicant of the provision of law or implementing regulation on which the refusal is based and of any statutory provision of law or implementing regulation under which administrative relief is available."[6]

50. There are no exceptions to the rule that once a visa application has been properly completed and executed before a consular officer, a visa must be either issued or refused. 9 FAM § 504.9-2. Accordingly, any noncitizen to whom a visa is not issued by the end of the working day on which the application is made, or by the end of the next working day if it is normal post-procedure to issue visas to some or all applicants the following day, must be found ineligible under one or more provisions of INA 212(a), 212(e), or 221(g). Furthermore, INA 221(g) is not to be used when a provision of INA 212(a) is applicable. *See* 9 FAM § 504.11-2(A)(a).

51. If the consular officer determines that the visa should be refused, the officer "shall provide the applicant a timely written notice" that states the basis for the denial and lists the specific provisions of the law under which the visa was refused. INA § 212(b), 8 USC § 1182(b); 22 § CFR 41.121(b).

---

[5] The federal regulations used to require "[t]he immigrant visa shall then be issued by delivery to the immigrant or the immigrant's authorized agent or representative" at 22 C.F.R. § 42.73(d), which was then removed by 84 Fed. Reg. 35299, July 23, 2019.

[6] State Department guidelines provide additional details regarding the manner in which visa applications should be refused, including a requirement that officers notify applicants, orally and in writing, who are refused a visa under INA Sections 212(a) or 221(g). *See* 9 FAM § 504.11-3(A)(1) (setting forth the required contents of 212(a) and 221(g) refusal letters).

52. If a consular officer determines that additional information is required from an applicant or that a SAO—known as "administrative processing"—is necessary to determine an applicant's eligibility, the officer must deny the application under INA § 221(g), pending future consideration once additional information is received or administrative processing is concluded. In the past the FAM categorized Section 221(g) refusals issued for the purpose of conducting administrative processing as "Quasi-Refusal Cases."

53. If at a visa interview, allegedly negative or concerning information exists about an applicant or someone with a similar name to the applicant as determined by the National Vetting Center's algorithm and databases, the consular officer receives a "red-light" response to one of the automated lookout systems. **Exhibit B**, *April 10, 2025, Declaration of Robert Jachim* at ¶¶ 14-15, 17.

54. When a consular officer encounters a "red light," they are required to refuse the application under INA section 221(g) and to request a [Security Advisory Opinion ("SAO")] from SAC, which initiates an interagency security review." *Id.* at ¶ 15. At the SAC, the security review is handled by one of two divisions: the Counterterrorism Division or the Screening Division. *Id.* at ¶ 20. As of April 7, 2024, Defendants have a mere 40 analysts addressing a backlog of 72,000 pending requests. *Id.* at ¶¶ 22-25.

55. Administrative Processing is primarily done by the SAC and the National Vetting Center. *Id.* at ¶¶ 2, 17. While Jachim's declaration does not illustrate clearly how the two agencies work together and/or delegate all visa types, he did explain that "the Counterterrorism Division handles approximately 55,000 SAO requests annually, down from approximately 115,000 SAO requests annually before moving nonimmigrant screening to the National Vetting Center Platforms." *Id.* at ¶ 23.

56. SAO requests are NOT addressed or resolved on a first-in-first-out basis. *Id*. at ¶ 27.

**c. Defendants' Mandatory Duty to Adjudicate Visa Applications.**

57. Congress requires that "[e]very alien applying for an immigrant visa…shall furnish to the consular officer with his application a copy of a certification by the appropriate police authorities stating what their records show concerning the immigrant; a certified copy of any existing prison record, military record, and record of his birth; and a certified copy of all other records or documents concerning him or his case which may be required by the consular officer. The copy of each document so furnished shall be permanently attached to the application and become a part thereof…All immigrant visa applications shall be reviewed and adjudicated by a consular officer." 8 U.S.C. §1202(b).

58. Defendants have a mandatory duty to adjudicate Plaintiffs' visa applications within a reasonable time. *Mohamed v. Pompeo*, No. 1:19-cv-01345-LJO-SKO, 2019 U.S. Dist. LEXIS 167266 (E.D. Cal. Sep. 27, 2019) (issuing a mandatory injunction ordering the DOS to complete adjudications of immigrant visa applications); 5 U.S.C § 555(b) (requiring agencies to, "within a reasonable time … conclude the matter presented to it"); *Nine Iraqi Allies Under Serious Threat Because of Their Faithful Serv. to the United States v. Kerry* ("*Nine Iraqi Allies*"), 168 F. Supp. 3d 268, 293 n. 22, 295–96 (D.D.C. 2016).

59. The INA, its implementing regulations, and preexisting Department policies in the FAM all mandate timely adjudication of immigrant visa applications.

60. Every foreign national executing an immigrant visa application "must be interviewed by a consular officer who shall determine on the basis of the applicant's representations and the visa application and other relevant documentation - (1) The proper immigrant classification,

if any, of the visa applicant, and (2) The applicant's eligibility to receive a visa." 22 C.F.R. § 42.62 (b).

61. After completing a medical examination, and paying applicable fees, the beneficiary is interviewed by a consular officer at the beneficiary's applicable U.S. Embassy or consulate. During the interview, the applicant executes Form DS-260 by swearing to or affirming its contents and signing it before a consular officer. *See* 22 C.F.R. §42.67.

62. Defendants have promulgated a regulation that says that a consular officer may require "the submission of additional information or question the alien on any relevant matter whenever the officer believes that the information provided in Form DS-230 or Form DS-260 is inadequate to determine the alien's eligibility to receive an immigrant visa." 22 C.F.R. §42.63.

63. The Department of State website instructs that at the end of one's immigrant visa interview at the U.S. Embassy or Consulate, the consular officer will inform the applicant whether their visa application is approved or denied. "If your visa is denied, you will be informed by the consular officer why you are ineligible to receive a visa."

64. At the interview, a consular officer must issue a visa to an eligible applicant.

65. Under 22 C.F.R. § 42.81(a), "when a visa application has been properly completed and executed before a consular officer in accordance with the provisions of the INA and the implementing regulations, the consular officer must issue the visa [or] refuse the visa under INA 212(a) or 221(g) or other applicable law."

66. If the applicant is admissible to the United States, the consular officer "shall" issue the selectee an immigrant visa and may only refuse a visa "upon a ground specifically set out in the law or implementing regulations." 22 C.F.R. § 40.6.

67. The FAM reiterates that "[o]nce an application has been executed, you must either issue the visa or refuse it [...]. You cannot temporarily refuse, suspend, or hold the visa for future action. If you refuse the visa, you must inform the applicant of the provisions of law on which the refusal is based, and of any statutory provision under which administrative relief is available." 9 FAM § 504.9-2.

68. If the consular officer determines that a visa should be issued, the officer is required to arrange the appropriate visa documentation and sign and seal the immigrant visa, consistent with the requirements set forth in 22 C.F.R. § 42.73.

69. Conversely, if the consular officer determines that the visa should be refused, the officer must have a basis for refusal that is "specifically set out in the law or implementing regulations." 22 C.F.R. § 40.6.

70. The officer also must comply with the refusal procedure outlined in 22 C.F.R. § 42.81(b), which mandates, in relevant part, that the "consular officer shall inform the applicant of the provision of law or implementing regulation on which the refusal is based and of any statutory provision of law or implementing regulation under which administrative relief is available."

71. According to 9 FAM § 504.11-2(A), there are no exceptions to the rule that once a visa application has been properly completed and executed before a consular officer, a visa must be either issued or refused. Further, any foreign national to whom a visa is not issued by the end of the working day on which the application is made, or by the end of the next working day if it is normal post procedure to issue visas to some or all applicants the following day, must be found ineligible under one or more provisions of INA 212(a), 212(e), or 221(g). Furthermore, INA 221(g) is not to be used when a provision of INA 212(a) is applicable.

72. The regulations and the FAM specify what are valid grounds for refusal.

73. When a temporary refusal is issued pursuant to INA § 221(g), the applicant must be notified both orally and through a refusal letter, which is required to "[e]xplicitly state the provision of the law under which the visa was refused." 9 FAM § 504.11-3(A)(1).

74. In the event that a visa is refused, the application must be reconsidered if "within one year from the date of refusal [the applicant] adduces further evidence tending to overcome the ground of ineligibility on which the refusal was based." 22 C.F.R. § 42.81(e).

75. In addition, 22 C.F.R. § 40.6 states that "[a] visa can be refused only upon a ground specifically set out in the law or implementing regulations."

76. A consular officer cannot temporarily refuse, suspend, or hold the visa for future action.

77. If the consular officer refuses the visa, he or she must inform the applicant of the provisions of law on which the refusal is based, and of any statutory provision under which administrative relief is available. 9 FAM § 504.1-3(g); *see* 9 FAM § 504.11-2(A)(b) ("There is no such thing as an informal refusal or a pending case once a formal application has been made."); *see also Alharbi v. Miller*, 368 F. 3d 527, 558 (E.D.N.Y. 2019) (holding that consular officers have a "nondiscretionary binary" duty to issue or refuse visas).

78. When read together, the INA, regulations, and DOS policy require applicants to submit their application including "documents concerning him or his case which may be required by the consular officer", and then for Defendants to process, interview, and issue visas to eligible visa applicants. 8 U.S.C. §1202(b).

## **STATEMENT OF FACTS**

79. Plaintiffs are applicants for an EB-2 NIW immigrant visa, with a derivative spouse and minor child on the visa application.

80. Plaintiffs' I-140 visa petition was approved by USCIS.

81. USCIS found Plaintiff Mostafavi's employment in the United States to be in the national interest. **Exhibit C**, *I-140 Approval Notice*.

82. Because Plaintiffs' immigration to the U.S. was in the national interest, USCIS waived the labor certification requirement through the NIW category of the EB-2 visa.

83. On November 8, 2022, Plaintiffs submitted a DS-260, and the DS-260 application was found by NVC to be "Documentarily Qualified" or "Documentarily Complete" on November 30, 2022.

84. On May 23, 2024 Plaintiffs attended a visa interview, 18 months after the visa application was first submitted.

85. Plaintiffs have been interviewed by a consular officer at the Embassy. Plaintiffs presented valid unexpired passports or other suitable travel documents. Plaintiffs furnished to the consular officer with their applications all documents concerning them which may be required by the consular officer. Yet, they received a request from the consular officer after the interview to submit the DS-5535, which Plaintiffs also submitted.

86. In the DS-5535, the consular officer requested 15 years of detailed history, including addresses, employment, travel, and social media handles.

87. Plaintiffs promptly completed and submitted their detailed response to the questionnaires.

88. Plaintiffs' case was placed into 221(g) administrative processing that was delayed two days shy of a year until the administrative processing was cleared on May 21, 2025 after Plaintiffs brought a mandamus and APA lawsuit against the government for the unreasonable delay.

89. With the resolution of the pending administrative processing, the Embassy emailed Plaintiffs instructing them to mail in their passports so that the visa may be issued (sometimes referred to as the visa stamp or the visa foil). **Exhibit D**, *Passport Email*.

90. Plaintiffs attempted to comply and submit their passports to the Embassy by courier, but a technical error in the Embassy's internet portal prevented Plaintiffs from printing the required unique identification number for passport submission. **Exhibit E,** *Declaration of Plaintiff Mostafavi*, ¶ 10.

91. The Embassy failed to take action to correct the technical error despite numerous emails from Plaintiffs requesting assistance. *Id.* at ¶ 11.

92. The portal malfunction persisted for three weeks, preventing Plaintiffs from delivering their passports to the Embassy. *Id.* at ¶ 12.

93. On June 18, 2025 the Embassy emailed Plaintiffs claiming they were ineligible for the immigrant visa under Proclamation 10949 and INA 212(f). **Exhibit A**, *212(f) Email*.

94. The email also denied Plaintiffs the opportunity and process to seek a National Interest Exception.

95. Defendants automatically denied the National Interest Exception without considering the national interest finding made by the Department of Homeland Security.

96. As the beneficiaries of an approved I-140 petition, Plaintiffs are entitled to adjudication and issuance of the immigrant visas <u>unless</u> they are ineligible under a specific ground of ineligibility set forth in the governing statutes and regulations.

97. As a direct result of Defendants' failure to timely issue final decisions on Plaintiffs' immigrant visa applications, Plaintiffs have experienced, and will continue to experience, severe, particularized, and concrete injury.

98. Plaintiffs have been procedurally injured by the delaying and withholding of adjudication of the visa application.

99. The failure of the Defendants to properly adjudicate Plaintiffs' applications and timely issue visas is causing severe emotional distress, professional and financial strain, and psychological harm to Plaintiffs mental health and wellbeing.

100. Defendants unreasonably delayed taking action to fix the portal error, delaying delivery of the passports for visa issuance, without explanation or on the grounds of any rational basis.

101. Defendants' are now withholding the visas with an arbitrary 212(f) determination that is causing irreparable injury to the Plaintiffs. Defendants' failure to act in accordance with law has exacted a significant toll on Plaintiffs that will not be relieved until Plaintiffs' proper visa adjudication is reinstated and the eligible visa issued.

102. Even though Plaintiffs' 221(g) administrative processing was concluded and the temporary refusal resolved for visa issuance, Defendants are now unlawfully subjecting Plaintiffs to Proclamation 10949, INA 212(f), Defendants' unlawful No Visa Policy and No National Interest Exception Policy.

103. When an immigrant visa applicant is refused under 212(f), there is no procedure that allows for the immigrant visa applicant to initiate a new immigrant visa application based upon the same petition, despite the underlying petition remaining valid and the EB-2 visa applicant being able to retain their priority date. 8 C.F.R. § 204.5; 9 FAM § 502.1-2(C)(b)(2).

**Proclamation 10949 and Its Dire Negative Impacts**

104. On June 4, 2025, Defendant Trump issued Proclamation 10949, which put in sweeping "full suspension of entry" of 12 countries including Iran and bans on immigrants, and bans on nonimmigrants on B-1, B-2, B-1/B-2, F, M, and J visas from additional 7 countries.

105. Proclamation 10949 provides some exceptions: anyone with a current green card or a current valid visa; people who are immediate relatives of a U.S. citizen (spouses, children under the age of 21, and parents); and refugees; asylees; and individuals granted humanitarian protection; diplomats and NATO personnel; dual nationals traveling on a non-banned-country's passport; children adopted abroad; Afghans seeking Special Immigrant Visas for their work helping U.S. armed forces; ethnic or religious minorities fleeing persecution in Iran; athletes, coaches, support staff, and immediate relatives of athletes participating in "major sporting events" like the World Cup and the Olympics; immigrant visas for ethnic and religious minorities facing persecution in Iran; and any individual whose entry is deemed in the "national interest", etc.

106. Although Proclamation 10949 purports to be supported by national security justifications, those justifications are contradicted by all established research. Indeed, they appear to have been created out of whole cloth and without any consideration of the issues.

107. According to the CATO Institute:

> A total of 237 foreign-born terrorists were responsible for 3,046 murders on US soil from 1975 through the end of 2024. The chance of a person perishing in a terrorist attack committed by a foreigner on U.S. soil over those 50 years was about 1 in 4.6 million per year. … For instance, the annual chance of being murdered in an attack committed by an illegal immigrant terrorist is zero.[7]

*See also* **Exhibit F**, *Articles on the unparalleled consequences of Proclamation 10949*.

108. However, Proclamation 10949 will create dire negative economic consequences to the national interest of the U.S. The Congress has found, and economic studies consistently show, that *increased* immigration levels into the U.S. have had *positive* impacts on the employment levels

[7] Alex Nowrasteh, *Terrorism and Immigration*, CATO Inst., Pol'y Anal. No. 911, Mar. 10, 2025, available at: https://www.cato.org/policy-analysis/terrorism-immigration-50-years-foreign-born-terrorism-us-soil-1975-2024.

and incomes of U.S.-born workers.[8] This is because foreign-born workers innovate more, creating jobs and increasing the productivity of U.S. workers;[9] they complement, rather than compete with, U.S.-Born workers in the workforce;[10] and they participate in the economy as consumers, stimulating demand.[11]

109. The Proclamation 10949's sweeping ban on both immigrant and nonimmigrant entry for the two-tier country list, which the Department of State has decided to implement by refusing to issue visas in any of the covered categories, is therefore directly and irrationally contrary both to decades of Congressional judgment. By dramatically limiting the number of foreign nationals entering the U.S. economy, Proclamation 10949 hinders economical development.

---

[8] *See, e.g.*, Jacqueline Varas, Am. Action Forum, *How Immigration Helps U.S. Workers and the Economy* (Mar. 20, 2017), https://goo.gl/ovHQEh; U.S. Chamber of Commerce, *Immigration Myths and Facts* (Apr. 14, 2016), https://tinyurl.com/yay4xjm9.

[9] Giovani Peri & Chad Sparber, Global Migration Center, *Presidential Executive Actions Halting High Skilled Immigration Hurt the US Economy*. Website: https://globalmigration.ucdavis.edu/presidential-executive-actions-halting-high-skilled-immigration-hurt-us-economy.

[10] *See, e.g.*, Matthew Denhart, George W. Bush Institute, *America's Advantage: A Handbook on Immigration and Economic Growth* 70, 118 (3d ed., Sept. 2017), https://tinyurl.com/y4ykokn9; Gretchen Frazee, *4 Myths About How Immigrants Affect the U.S. Economy*, PBS NewsHour (Nov. 2, 2018), https://tinyurl.com/yxlwzkth; Maria E. Enchautegui, *Immigrant and Native Workers Compete for Different Low-Skilled Jobs*, The Urban Institute: Urban Wire (Oct. 13, 2015), website: https://tinyurl.com/ycayp6ky; U.S. Chamber of Commerce, *supra* note 18.

[11] Kenneth Megan, Bipartisan Policy Ctr., *Immigration and the Labor Force* (Aug. 25, 2015), https://goo.gl/8p3SP8 ("[A] breadth of research indicates that immigration can be complementary to native born employment, as it spurs demand for goods and services"); Giovanni Peri, *The Effect of Immigrants on U.S. Employment and Productivity*, Fed. Reserve Bank of S.F. Econ. Letter (Aug. 30, 2010), website: https://www.frbsf.org/research-and-insights/publications/economic-letter/2010/08/effect-immigrants-us-employment-productivity/; Buttonwood, *Keep on Trucking*, The Economist (Feb. 11, 2012), https://goo.gl/x8vqaL ("When people work for a living, they earn money. They spend that money on goods and services that are produced by other people.")

110. The dire personal consequences of Proclamation 10949 are much more severe, projecting about 120,000 non-exempt permanent immigrants and over half a million temporary travelers, family separation and human suffering, costing billions of dollars income and tax revenue, as well as disrupting "the way knowledge about health is shared." **Exhibit F**, *Articles on the unparalleled consequences of Proclamation 10949*.

111. The administration is further considering adding an additional 36 countries to the banned list. **Exhibit G**, *Trump considers adding 36 countries to travel ban list*.

112. As discussed above, the justification for Proclamation 10949 is also flimsy. **Exhibit F**, *Articles on the unparalleled consequences of Proclamation 10949*. On balance, the costs of the travel ban far exceeds the benefits from it. This failed equation further calls for the deliberating body of Congress instead of the executive department.

**Separation of Powers and Nondelegation Doctrine**

113. Back in 2018, the Supreme Court upheld the third version of then Defendant Trump's Proclamation No. 9645, *Enhancing Vetting Capabilities and Processes for Detecting Attempted Entry Into the United States by Terrorists or Other Public-Safety Threats*. 82 Fed. Reg. 45161 (Sep. 27, 2017) ("Muslim Ban") after the first two versions were initially struck down. *Trump v. Hawaii*, 585 U.S. 667, 138 S. Ct. 2392 (2018). The court's flawed ruling precludes challenges based on discriminatory intent despite overtly overruling *Korematsu v. United States*, 323 U.S. 214, 65 S. Ct. 193 (1944). *Trump v. Hawaii*, 585 U.S. at 710, 138 S. Ct. at 2423.

114. The high court, however, did not address whether in issuing the Muslim Ban, the then President exceeded his delegated authority from the Congress. 8 U.S.C. § 1182(f).

115. The controlling of immigration to the U.S. has always been Congressional prerogative. Despite not enumerated, the Constitution explicitly grants Congress the exclusive federal plenary power to establish a "uniform Rule of Naturalization," as well as the enumerated

power to regulate foreign commerce. U.S. CONST. ART. I, § 8, Cls 3-4. Such sovereign power traced as far back as the Alien Enemies Act of 1798, 50 U.S.C.S. § 21. In the 1889 *Chinese Exclusion Case* that upheld the deeply racist Chinese Exclusion Act of 1882 the Supreme Court stated that the authority belongs to "the legislative department." 130 U.S. 581, 603, 9 S. Ct. 623, 629 (1889). The Supreme Court provided that "the formulation of these policies is entrusted exclusively to Congress has become about as firmly embedded in the legislative and judicial tissues of our body politic as any aspect of our government." *Kleindienst v. Mandel*, 408 U.S. 753, 767 (1972) (citing *Lem Moon Sing v. United States*, 158 U.S. 538, 547 (1895)); *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 543, 70 S. Ct. 309, 313 (1950) ("[n]ormally Congress supplies the conditions of the privilege of entry into the United States.")

116. It is the role of Congress, not the President, to "exclude aliens altogether or prescribe terms and conditions upon which they may come into or remain in this country." *See Fok Young Yo v. United States*, 185 U.S. 296, 302 (1902).

117. In that role, and pursuant to that power, Congress has crafted a complex and carefully balanced system of immigrant and nonimmigrant visas, and in doing so considered the effects that the issuance of visas and entry of foreign nationals may have on the U.S. economy and labor market, as well as the security risks, if any, to the public.

118. In contrast, the President does not have a unilateral power to limit the flow of immigration in peace and normal times. U.S. CONST. ART. II. And we are in a peaceful and normal time. *Contra*. *Knauff*, 338 U.S. at 543 ("during a time of national emergency").

119. In this context, Congress cannot be understood to have delegated to the President (through 8 U.S.C. § 1182(f) or § 1185(a)) the authority to override decades of Congressional judgment regarding the interaction of immigration policy and the labor market.

120. The delegation from the Congress to the President in the broad language of 8 U.S.C. §§ 1182(f) and/or 1185(a), cannot be without limits, especially when the consequence of such action has grave and devastating consequences. *Doe v. Trump*, 957 F.3d 1050, 1067 (9th Cir. 2020); *V.O.S. Selections, Inc. v. United States*, Nos. 25-00066, 25-00077, 2025 Ct. Intl. Trade LEXIS 67, at *37 (Ct. Int'l Trade May 28, 2025); *West Virginia v. EPA*, 597 U.S. 697, 741, 142 S. Ct. 2587, 2619 (2022) (citing *Industrial Union Dept., AFL-CIO v. American Petroleum Institute*, 448 U. S. 607, 645, 100 S. Ct. 2844, 65 L. Ed. 2d 1010; and *Mistretta v. United States*, 488 U. S. 361, 373, n. 7, 109 S. Ct. 647, 102 L. Ed. 2d 714 (1989).)

121. To the extent that 8 U.S.C. §§ 1182(f) and/or § 1185(a) could be interpreted to delegate to the President authority to engage in domestic policy-making concerning purely economic matters such as the labor market, the statutes provide no intelligible principle to guide the President's exercise of discretion. They therefore violate constitutional nondelegation principles and are invalid. *See Doe v. Trump*, 418 F. Supp. 3d 573, 589-93 (D. Or. 2019). A Proclamation issued under such an unconstitutional delegation of legislative authority is invalid, null, and void.

122. Proclamation 10949 is accordingly in conflict with either the INA or the Constitution, and in either case it impermissibly violates the Constitution's separation of powers.

**Defendants' No NIE Policy**

123. Proclamation 10949 provides an exception for individuals who "would serve a United States national interest" ("NIE"). However, Defendants in implementing the NIE, *i.e*. the procedure and decision-making process of the NIE, seemingly offer the National Interest Exception to no one, and seem to promulgate a No NIE Policy.

124. Such No NIE Policy has two aspects, both procedurally and substantively.

125. Procedurally, Defendants leave no channel to supplement the visa application to consider for the NIE. **Exhibit H**, *Applying NIE only via a New Visa Application*. This is arbitrary and capricious on its face.

126. Substantively, in granting the National Interest Waiver petition, USCIS had already certified that the admission of the self-petitioner is in the national interest. 8 U.S.C. § 1153(b)(2)(B)(i); *see Matter of Dhanasar*, 26 I&N Dec. 884 (AAO 2016);8 U.S.C. § 1153(b)(1). In their email, Defendants divulged their position that such national interest from USCIS's determination of national interest does not give any deference to NIE. **Exhibit I**, *State Department's Arbitrary and Capricious Position on NIE*. Defendants' substantive determination on NIE is also arbitrary and capricious.

127. Both procedural and substantive aspects of the No NIE Policy are arbitrary and capricious.

**Defendants' No Visa Policy**

128. The Department's policies, procedures, and practices suspending immigrant visa applications for Plaintiffs and their derivative beneficiaries ("No Visa Policy") relies in part on Proclamation 10949.

129. Proclamation 10949 precludes entry into the United States for individuals subjected to the Proclamation. The Proclamation does not ban adjudication and issuance of immigrant visas.

130. Contrary to 8 U.S.C. § 1202(b) and (d), Defendants have denied consular officers from performing their duties—that is, Defendants have denied consular officers the authority to adjudicate immigrant visa applications. *Cf.* 8 U.S.C. § 1104(a) (denying the Secretary of State of "those powers, duties, and functions conferred upon the consular officers relating to the granting or refusals of visas").

131. The Department's policies, procedures, and practices suspending immigrant visa applications for Plaintiffs and their derivative beneficiaries also conflates Proclamation 10949's suspension of entry with a ban on visa issuance. Proclamation 10949 does not preclude the issuance of immigrant visas for Plaintiffs and their derivative beneficiaries.

132. Defendants have explicitly applied these improper and unlawful prerequisites to Plaintiffs.

133. Section 212(f) of the INA reads, in relevant part, as follows: "Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate." 8 U.S.C. 1182(f).

134. There is no language in Section 212(f) that gives the President the authority to suspend the adjudication of visas. Moreover, while previous presidents have relied on Section 212(f) to preclude the entry of certain immigrants, Section 212(f) cannot be utilized to prevent the adjudication of visas.

135. Federal courts have found that the President does not have authority under INA § 212(f) to suspend the adjudication of immigrant visas. *Rai v. Biden*, 567 F. Supp. 3d 180, 194 (D.D.C. 2021) ("While Proclamations 9984 and 10143 address the entry of immigrants into the country, they say nothing about the issuance and adjudication of visas."); *Nine Iraqi Allies*, 168 F. Supp. 3d at 290-91; *Gomez v. Trump*, 485 F. Supp. 3d 145, 176 (D.D.C. 2020); *Moghaddam v. Pompeo*, 424 F. Supp. 3d 104, 114 (D.D.C. 2020).

136. Accordingly, Defendants' policies, procedures, and practices suspending the adjudication and issuance of immigrant visas for Plaintiffs are reviewable under the APA, because Defendants are violating the Constitution, the INA, and federal regulations by refusing to adhere to a proper adjudication of the visa applications for Plaintiffs as eligible visa-applicants subjected to Proclamation 10949 suspending entry based on Section 212(f).

## CAUSES OF ACTION

### COUNT ONE: Separation of Powers/Nondelegation Doctrine

137. Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

138. The control of immigration to the U.S. is defined by Congressional prerogative. *Mandel*, 408 U.S. at 767. The federal plenary power of Congress over immigration has been confirmed time and time again by the Supreme Court.

139. In contrast, the President does not have a unilateral power to limit the flow of immigration in peace times.

140. The Congress, via Section 212(f) of the INA delegated authority to suspend the entry of certain noncitizens, which reads, in relevant part, as follows: "[w]henever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate." 8 U.S.C. 1182(f).

141. However, the delegation of authority from Congress to the President in the broad language of 8 U.S.C. 1182(f) has its limits. *Doe v. Trump*, 957 F.3d 1050, 1067 (9th Cir. 2020).

142. Firstly, the consequence of such action has grave and devastating consequences. The unparalleled consequences of Proclamation 10949 are numerous and against the national interest of the U.S. **Exhibit F**, *Articles on the unparalleled consequences of Proclamation 10949*.

143. Secondly, the justification of Proclamation 10949 is flimsy, divorced from national security concerns, and does not reasonably justify such dire consequences.

144. The administration is further considering expanding the travel ban despite the undesired consequences and lack of deliberation and/or reasonable basis. **Exhibit G**, *Trump considers adding 36 countries to travel ban list*.

145. Proclamation 10949 exceeds the express delegation of 8 U.S.C. 1182(f) and lacks an intelligible principle that justifies the encroachment on the inherent power of Congress.

146. The court has equity power to enjoin the President to discharge a duty over which he has no discretion. *Aviel v. Gor*, No. 25-5105, 2025 U.S. App. LEXIS 13945, at *14 (D.C. Cir. June 5, 2025).

147. Proclamation 10949 is unlawful based on the nondelegation doctrine and is in violation of the separation of powers.

**COUNT TWO: 5 U.S.C. § 706(2)(A) and (D).**

*No NIE Policy is Arbitrary and Capricious*

148. Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

149. Proclamation 10949 provides an exception for individual who "would serve a United States national interest."

150. However, Defendants' policy and procedure in implementation of the NIE, as the No NIE Policy, is arbitrary and capricious in violation of 5 U.S.C. § 706(2)(A) and (D).

151. Defendants fail to provide channels or viable procedure to submit additional documents for considering NIE. **Exhibit H**, *Applying NIE only via a New Visa Application*.

152. Defendants refuse to accept additional documents to consider NIE and would only claim to consider it when a new visa application is filed.

153. Defendants decline to consider the national interests already certified by another agency in considering NIE. **Exhibit I**, *State Department's Arbitrary and Capricious Position on NIE*.

154. Defendants' procedure to consider NIE is arbitrary and capricious.

155. Defendants' substantive decision not to defer to the Department of Homeland Security's determination of national interest through USCIS is arbitrary and capricious.

156. Due to Defendants' implementation, the existence of NIE in Proclamation 10949 is superficial and unattainable, amounting to a No NIE Policy.

157. Both aspects of the No NIE Policy are arbitrary and capricious.

## COUNT THREE: 5 U.S.C. § 706(2)(C)

### *The No Visa Policy is Not in Accordance with the Law*

158. Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

159. Proclamation 10949 is in excess of the President's authority under Sections 212(f) and 215(a) of the INA (8 U.S.C. §§ 1182(f), 1185(a)) and expressly overrides the INA.

160. The President may not "nullify[] Congress's considered judgments on matters of immigration." *See Hawaii v. Trump*, 878 F.3d 662, 685 (9th Cir. 2017), *rev'd on other grounds*, 138 S. Ct. 2392 (2018); *see Doe v. Trump*, 957 F.3d 1050, 1067 (9th Cir. 2020) (proclamation at issue "rais[es] serious questions as to whether the President has effectively rewritten provisions of

the INA."); *cf. Hawaii*, 138 S. Ct. at 2411 ("We may assume that §1182(f) does not allow the President to expressly override particular provisions of the INA.").

161. In *Gomez v. Trump*, the Court found that sections 1201(g) and 1182(a) do not authorize the State Department to suspend visa adjudications when the President suspends entry. 485 F. Supp. 3d at 192.

162. In *Milligan v. Pompeo*, the Court found that "Plaintiffs have shown that a preliminary injunction is warranted on their section 1182(f)-related claim, the Court will enjoin the State Department from relying on the Presidential Proclamations to suspend all visa adjudications for Proclamation Plaintiffs." 502 F. Supp. 3d 302, 322 (D.D.C. 2020).

163. In *Young v. Trump*, the Court found "Defendants have identified no apt statutory authority that permits DOS to suspend the processing of visa applications for applicants who are covered by the Proclamation." 506 F. Supp. 3d 921, 945 (N.D. Cal. 2020).

164. In *Tate v. Pompeo*, the Court found "Plaintiffs have shown that a preliminary injunction is warranted on their claim that defendants' implementation of the Presidential Proclamations under § 1182(f) to suspend issuance of O visas in Proclamation-designated countries violates the APA, and the State Department is enjoined from relying on the Presidential Proclamations to suspend or refuse visa adjudications for those plaintiffs covered by the Proclamations." 513 F. Supp. 3d 132, 154 (D.D.C. 2021).

165. As such, it is well settled law that Defendants cannot rely on INA § 212(f) to refuse adjudication of immigrant visas. *Rai v. Biden*, 567 F. Supp. 3d 180 (D.D.C. 2021).

166. Congress has afforded consular officers the authority to issue visas to immigrants "who ha[ve] made proper application therefore." 8 U.S.C. § 1201(a)(1).

167. Neither § 1182(f) nor § 1185(a) permits the President by proclamation to suspend consular officers' discretion to issue visas in cases where proper applications have been made.

168. Neither § 1182(f) nor § 1185(a) permits the Department's suspended adjudication of immigration visas.

169. The Court has inherent equitable power to enjoin actions by federal officers in excess of their lawful authority. *See*, *e.g.*, *Sierra Club v. Trump*, 929 F.3d 670, 694 (9th Cir. 2019) ("The Supreme Court has 'long held that federal courts may in some circumstances grant injunctive relief against' federal officials violating federal law.") (quoting *Armstrong v. Exceptional Child Ctr., Inc*., 135 S. Ct. 1378, 1384 (2015)); *E.V. v. Robinson*, 906 F.3d 1082, 1090–91 (9th Cir. 2018) (acknowledging freestanding cause of action for "suits alleging that a federal official acted ultra vires of statutorily delegated authority" or "violated the Constitution"); *Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 189–190 (D.C. Cir. 2006) ("[J]udicial review is available when an agency acts ultra vires, even if a statutory cause of action is lacking.") (quotation marks omitted).

**COUNT FOUR: 5 U.S.C. § 706(2)(A)**

*The No Visa Policy is Arbitrary and Capricious*

170. Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

171. Proclamation 10949 restricts the entry of certain immigrants into the United States. The entry bans contained in the proclamation are not plausibly or rationally related to a suspension on visa adjudication.

172. Defendants have disregarded the serious reliance interests engendered by the I-140 approval. Defendants must, in addition to demonstrating that there are good reasons for the new

policy, offer "a reasoned explanation ... for disregarding facts and circumstances that underlay or were engendered by the prior policy." *FCC v. Fox Television*, 556 U.S. 502, 515 (2009).

173. In FY2020, the Department suspended the adjudication of Diversity Visas from March 2020 until the *Gomez* Court issued its preliminary injunction on September 4, 2020. The *Gomez* Court found that defendants had no legal basis to reason that presidential proclamations suspending entry permitted the Department of State to suspend adjudication of diversity visas.

174. Similarly, Defendants here have no legal basis to rely on Proclamation 10949 to find that suspension of entry permits the State Department to suspend issuance of Plaintiffs' immigrant visas that were already adjudicated and cleared administrative processing.

175. Proclamation 10949 is not a lawful basis to refuse a visa. 20 C.F.R. § 40.6 ("a visa can be refused only upon a ground specifically set out in the law or implementing regulations").

176. Thus, the restrictions on entry imposed by Proclamation 10949 are not grounds for the State Department to depart from the stated policies and regulations that mandate adjudication of immigrant visa applications and issuance to eligible visa applicants.

177. Because Proclamation 10949 does not give the authority to the State Department to suspend Plaintiffs' immigrant visas, Defendants' actions are arbitrary, capricious, and not in accordance with law. *Rai v. Biden*, 567 F. Supp. 3d 180 (D.D.C. 2021).

**COUNT FIVE: Violation of the APA, 5 U.S.C. § 706(2)**

*Withholding of Issuance of Plaintiffs' Immigrant Visa Applications*

178. Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

179. The State Department is an Agency subject to the requirements of the APA, 5 U.S.C. § 701(b)(1).

180. Under 5 U.S.C. § 706(2), courts shall hold unlawful and set aside agency action that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right, power, privilege, or immunity; in excess of statutory jurisdiction, authority, or limitations; or without observance of procedure required by law.

181. The APA defines action, in part, as a "failure to act." 5 U.S.C. § 551(13).

182. The APA authorizes courts to compel agency action for two distinct types of "failures to act" – (1) unlawful withholding of agency action or (2) unreasonable delay of agency action. 5 U.S.C. § 706(1).

183. Here, Defendants have unlawfully withheld agency action in contravention of statutes, regulations, and stated policy pronouncement.

184. Plaintiffs have fulfilled all requirements, paid all fees, and are otherwise eligible for an immigrant visa. Yet Defendants have failed to act pursuant to the adjudication of the visa applications within a reasonable time and have instead unlawfully withheld agency action, leaving Plaintiffs in indefinite limbo and the resulting consequences.

185. Defendants did not act to correct the technical error that prevented Defendants from receiving Plaintiffs' passports for visa issuance.

186. The unlawful withholding and unreasonable delay on Plaintiffs' immigrant visas constitutes a final agency action that is reviewable by this Court. *Whitman v. Am. Trucking Ass'n*, 531 U.S. 457, 478 (2001); *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997).

187. Agency action "cover[s] comprehensively every manner in which an agency may exercise its power." *Whitman*, 531 U.S. at 478.

188. Agency action that is final is "mark[ed by] the consummation of the agency's decision-making process" and "be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997).

189. As demonstrated above, Defendants have failed to timely act on the adjudicated visas, effectively suspending the processing and adjudication of a visa for otherwise qualified and eligible applicants.

190. Defendants' inaction, in this case, creates jurisdiction. *Moghaddam v. Pompeo*, 424 F. Supp. 3d 103, 114 (D.D.C. 2020) (quoting *Patel v. Reno*, 134 F.3d 929, 931–32 (9th Cir. 1997)); see also Nine Iraqi Allies, 168 F. Supp. 3d at 290–91, ("When the Government simply declines to provide a decision in the manner provided by Congress, it is not exercising its prerogative to grant or deny applications but failing to act at all.").

191. Plaintiffs and their dependents were harmed by Defendants' inaction and delay.

192. Plaintiffs will continue to be irreparably harmed by these unlawful acts absent an injunction from this Court enjoining Defendants from withholding proper adjudication and issuance of Plaintiffs' immigrant visas.

**COUNT SIX: Violation of the APA, 5 U.S.C. § 706(1)**

*Withholding of a Mandatory Entitlement Owed to Plaintiffs*

193. Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

194. Section "706(1) grants judicial review if a federal agency has a 'ministerial or non-discretionary' duty amounting to a 'specific, unequivocal command.'" *Anglers Conservation Network v. Pritzker*, 809 F.3d 664, 670 (D.C. Cir. 2016).

195. Under section 706(1) of the APA, the court may "compel agency action unlawfully withheld." 8 U.S.C. § 706(1).

196. The timely action on approved visa applications are not optional. This is not committed to agency discretion, nor are the statutes, regulations, and policies, so broad as to provide no meaningful standard to judge the agency's action. Rather, these duties and how Defendants must undertake them are detailed in the INA, the FAM, and its governing regulations.

197. Defendants' conduct is contrary to the INA's mandate that all immigrant and nonimmigrant "visa applications shall be reviewed and adjudicated by a consular officer" 8 U.S.C. § 1202(b), (d), and 8 U.S.C. § 1201(a)(1) which provides that a "consular officer may issue" a visa to an individual who has "made proper application therefor."

198. Pursuant to sections 1202(b) and 1202(d) of the INA, Defendants owe a nondiscretionary duty to Plaintiffs, which require that all immigrant and nonimmigrant visa applications "shall be reviewed and adjudicated by a consular officer" and creates a discrete, legally required action. 8 U.S.C. § 1202(b), (d) (emphasis added).

199. Congress's use of the word "shall" imposes a mandatory non-ministerial duty on consular officers to review, adjudicate, and issue fiancé visas. *Sierra Club v. E.P.A.*, 705 F.3d 458, 467 (D.C. Cir. 2013) ("the word 'shall' ... evidences a clear legislative mandate…")

200. Likewise, the Code of Federal Regulations is unambiguous that Defendants have a mandatory and affirmative duty to interview immigrant visa applicants and adjudicate properly filed immigrant visa applications. Under 22 C.F.R. § 42.81(a), "when a visa application has been properly completed and executed before a consular officer in accordance with the provisions of the INA and the implementing regulations, the consular officer must issue the visa [or] refuse the visa under INA 212(a) or 221(g) or other applicable law."

201. Defendants have a "nondiscretionary, ministerial" duty to act. The INA governs visa processing and "confers upon consular officers' exclusive authority to review applications for

visas. *Saavedra Bruno v. Albright*, 197 F. 3d 1153, 1156 (D.C. Cir. 1999); see also § 201(e), INA §§ 101(a)(9), (16); a "consular office is required by law to act on visa applications." *Patel v. Reno*, 134 F.3d 929, 932 (9th Cir. 1997).

202. Defendants owe Plaintiffs a nondiscretionary, ministerial duty to act upon the immigrant visa application, one that they have failed to fulfill. *See* INA §201(e); INA §§ 101(a)(9), (16); 22 C.F.R.§ 42.62; *see also*, *e.g.*, *Donovan v. United States*, 580 F.2d 1203, 1208 (3d Cir. 1978) (holding that mandamus is an appropriate remedy whenever a party demonstrates a clear right to have an action performed by a government official who refuses to act).

203. Defendants have refused to process and issue Plaintiffs' visas based on their adjudicated applications despite their eligibility for immigrant visas and in advance of Proclamation 10949.

204. Defendants are unlawfully withholding discrete action they are required to take within the temporal limits imposed by statute and the express intent of Congress, and as outlined above they have failed to properly adjudicate and issue Plaintiffs' immigrant visa applications in contravention of that nondiscretionary duty.

**COUNT SEVEN: Violation of the APA; 5 U.S.C. § 555(b)**

*Unreasonably Delayed Immigrant Visa*

205. Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

206. Pursuant to the APA, Defendants have a nondiscretionary duty to conclude a matter presented to it within a reasonable time. *See* 5 U.S.C. § 555(b).

207. Pursuant to the APA, 5 U.S.C. §706(1), a court may compel agency action unlawfully withheld or unreasonably delayed.

208. Plaintiffs' claims implicate the statutory mandate that "[a]ll immigrant visa applications shall be reviewed and adjudicated by a consular officer," 8 U.S.C. § 1202(b), and that an immigrant visa should be "properly issued by a consular officer." 8 U.S.C. § 1101(a)(16). Defendants' failure to act does not absolve them of this congressionally mandated duty.

209. Defendants have unreasonably delayed processing Plaintiffs' visas since the date of the visa interview.

210. "Reasonable time for agency action is typically counted in weeks or months, not years." *In re Am. Rivers & Idaho Rivers United*, 372 F.3d 413, 419 (D.C. Cir. 2004).

211. Defendants have failed to adjudicate, process, and issue immigrant visas for Plaintiffs within a reasonable time.

212. Plaintiffs have submitted all required information, documents, and payments and are eligible for the visa they seek, and yet, Defendants have failed to issue visas after the administrative processing was cleared

213. In combination, Defendants' delay issuing proper adjudications on the immigrant visa applications and then delay issuing the visas until Proclamation 10949 came into effect was unreasonable.

214. Absent an order from this Court, Defendants will claim the improper 212(f) refusal is a final decision and will fail to issue the visas based on the previous adjudication of the applications that took place before Proclamation 10949. Due to Defendants unreasonable delay, Plaintiffs are now suffering from Proclamation 10949, No Visa Policy, and No NIE Policy.

215. Plaintiffs were harmed and will continue to suffer irreparable harm if Defendants persist in unreasonably delaying the processing of Plaintiffs' immigrant visa applications.

**COUNT EIGHT: Mandamus Act, 28 U.S.C. § 1361**

216. Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

217. Under 28 U.S.C. § 1361, "[t]he district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff."

218. A mandamus plaintiff must demonstrate that: (i) he or she has a clear right to the relief requested; (ii) the defendant has a clear duty to perform the act in question; and (iii) no other adequate remedy is available. *Liberty Fund, Inc. v. Chao*, 394 F. Supp. 2d 105, 113 (D.D.C. 2005); see also Patel, 134 F. 3d at 933 (duty to adjudicate an immigrant visa application).

219. The Plaintiffs clearly meet all three of these criteria. *See*, *e.g.*, *Raduga USA*, 440 F. Supp. 2d at 1146 ("Plaintiffs' claim here is clear and certain, and the consul's nondiscretionary, ministerial duty is plainly prescribed. Furthermore, Plaintiffs have no other means to compel the United States consul to make a decision.") *United States v. Kerry*, 168 F.Supp.3d 268, 291-92 (D.D.C. 2016)(holding the doctrine of consular non-reviewability did not apply where plaintiffs' visa applications were not formally refused, but were held in "administrative processing"); *see also Patel v. Reno*, 134 F.3d 929, 932-33 (9th Cir. 1997) (affirming the granting of mandamus relief where plaintiff's application had only been "provisionally refused"); *Maramjaya v. U.S. Citizenship & Immigration Servs*., 2008 WL 9398947, at 4 (D.D.C. Mar. 26, 2008) (holding that the doctrine of consular non-reviewability did not apply when the case had not procedurally progressed to the point where consular immunity would bar judicial review").

220. Plaintiffs have fully complied with all statutory and regulatory requirements for obtaining visas, including obtaining approval of I-140 petition, applying for their visa with a properly filed DS-260, and submitting all necessary documentation and paying all required fees.

221. Defendants have a clear non-discretionary duty to adjudicate immigrant visa applications and issue visas to Plaintiffs who are eligible to receive visas and not inadmissible under 8 U.S.C. § 1182(a).

222. Defendants owe Plaintiffs a duty to act according to law upon Plaintiffs' immigrant visa applications. The INA and the relevant regulations impose on the Defendants a non-discretionary duty to timely adjudicate Plaintiffs' visa applications and to issue visas to applicants found eligible.

223. This duty is owed under the INA, federal regulations, and published agency guidance. *See* INA § 201(b)(2)(A)(i); INA §§ 101(a)(9), (16); 22 C.F.R. § 42.81(a); *see also*, *e.g.*, *Donovan v. United States*, 580 F.2d 1203, 1208 (3d Cir. 1978) (holding that mandamus is an appropriate remedy whenever a party demonstrates a clear right to have an action performed by a government official who refuses to act).

224. Nonetheless, Defendants failed to adjudicate Plaintiffs' visa applications, thereby depriving Plaintiffs of their rights under 22 C.F.R. § 42.81(a), 8 U.S.C. 1184(d)(1), and the APA to have a properly filed visa application decided in a timely manner.

225. Defendants then failed to take action to facilitate issuance of the visas.

226. Defendants now fail to adhere to their duty to adjudicate and issue visas by making an improper INA 212(f) refusal.

227. Adjudication of Plaintiffs' applications are a purely ministerial, non-discretionary act which the Defendants are under obligation to perform in a timely manner; the Plaintiffs have no alternative means to obtain adjudication of the visa; and their right to issuance of the writ is "clear and indisputable." *Allied Chemical Corp. v. Daiflon, Inc*., 449 U.S. 33, 35 (1980); *see also*, *First Federal Savings and Loan Ass'n of Durham*, 860 F.2d at 138; *Patel*, 134 F.3d at 933 ("[W]e

find that the consulate had a duty to act and that to date ... the consulate has failed to act in accordance with that duty and the writ [of mandamus] should issue.").

228. Mandamus action is also appropriate because Defendants failed to act within a reasonable time. *See*, *e.g*., *Liu v. Novak*, 509 F. Supp. 2d 1, 9 (D.D.C. 2007) (holding that the APA requires the government to act within a reasonable period of time); *see also*, *Sierra Club v. Thomas*, 828 F.2d 783, 794 (D.C. Cir. 1987) (stating that "regardless of what course it chooses, the agency is under a duty not to delay unreasonably in making that choice").

229. It is the sense of Congress that the processing of an immigration benefit application should be completed not later than 180 days after the initial filing of the application. *See* 8 U.S.C. § 1571 and (Pub. L. 106–313, title II, §202, Oct. 17, 2000, 114 Stat. 1262.). Defendants have failed in their duty to process Plaintiffs' visa applications by refusing to act for an entirely unreasonable amount of time and well over 180 days.

230. Defendants have failed to carry out the administrative functions delegated to them by law. *See* INA § 201(b)(2)(A)(i), INA §§ 101(a)(9), (16); 22 C.F.R. § 42.81(a) and 42.81(e).

231. Defendants have a clear, non-discretionary, and mandatory duty to process the Plaintiffs' applications. There is no legal bar to doing so.

232. Defendants have no legal basis for failing to proceed with a lawful adjudication of the Plaintiffs' applications and issuance of the visas.

233. No alternative remedy exists to compel action by Defendants.

234. Accordingly, Plaintiffs have a clear and indisputable right to lawful agency action on their visa applications.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court grants them the following relief:

A. Declare Defendants' Proclamation 10949 as an unlawful misinterpretation of INA 212(f) exceeding congressional delegation of authority, and thus, Plaintiffs were injured by Proclamation 10949;

B. Declare Defendants' No NIE Policy as arbitrary and capricious, and thus, Plaintiffs were injured by Defendants' No NIE Policy;

C. Declare Defendants' No Visa Policy as unlawful and inconsistent with 8 U.S.C. §1202(b), and thus, Plaintiffs were injured by Defendants' No Visa Policy;

D. Declare Defendants' No Visa Policy as arbitrary and capricious, and thus, Plaintiffs were injured by Defendants' No Visa Policy;

E. Declare that the Defendants' withholding of a proper adjudication of Plaintiffs' immigrant visa applications and failure to facilitate issuance of the visas in Plaintiffs' passports unreasonable and violates the INA and applicable statutes, regulations, agency guidance, and that Plaintiffs are entitled to prompt action on the immigrant visas pursuant to the Declaratory Judgement Act 28 U.S.C. § 2201;

F. Issue a writ of mandamus compelling the Defendants and those acting under them to perform their duty to complete all steps necessary to proces Plaintiffs' immigrant visas, within thirty (30) days from the date of the order pursuant to the Court's mandamus authority under 28 U.S.C. § 1361;

G. Issue an order setting aside the 212(f) refusal as unlawful and compelling the Defendants and those acting under them to fulfil their duty to adjudicate the immigrant visa applications on lawful grounds and adhere to the previous approval of the visas manifest by clearance of the administrative processing, within 30 days of the order pursuant to the APA;

H. Enjoin Defendants and those acting under them from any further unreasonable delay in processing of Plaintiffs' pending immigrant visas;

I. Retain jurisdiction over this action to monitor and enforce Defendants' compliance with all orders of this Court;

J. Award Plaintiffs reasonable attorney fees and costs pursuant to the Equal Access to Justice Act, 42 U.S.C. § 1988, 5 U.S.C. § 504, 28 U.S.C. § 2412 and any other applicable law; and

K. Grant such further relief as this Court deems just and proper.

DATED: August 15, 2025

Respectfully submitted,

*/s/ Amelia Ritenour*
Amelia Ritenour
Law Offices of Stephen E Bandar
6 Lincoln Knoll Ln #102
Burlington, MA 01803
(781) 640-2611
aritenour@bandarlawoffice.com
*Local Counsel*

Garrett Carter May
Red Eagle Law LC
5256 S. Mission Road, Suite 135
Bonsall, CA 92003
(714) 661-3446
garrett@redeaglelaw.com
*Attorney for Plaintiffs*
**Motion for Pro Hac Vice Forthcoming*